# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| ROBERT GARFIELD, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **CIVIL ACTION NO.** |
| Plaintiff, | ) ) $3.04$-CV-$78$-$J$-$32$ $mcR$ ) |
| vs. | ) **CLASS ACTION COMPLAINT** ) |
| WINN-DIXIE STORES, INC., ALLEN ROWLAND, FRANK LAZARAN, and RICHARD P. McCOOK | ) ) ) **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) |

Plaintiff, Robert Garfield ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Winn-Dixie Stories, Inc. ("Winn-Dixie" or the "Company") securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

G:\cgbc\winn-dixie\pld\winn.cixie.complaint.wpd

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the publicly traded securities of Winn-Dixie Stories, Inc. between October 9, 2002 and January 29, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff Robert Garfield bought shares of Winn-Dixie during the Class Period and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

7.      Defendant Winn-Dixie is a Florida corporation that maintains its principal place of business within this judicial district at 5050 Edgewood Court, Jacksonville, Florida.

8.      Defendant Allen Rowland ("Rowland") was the Company's Chief Executive Officer, President, and Director until June 26, 2003.

9.      Defendant Frank Lazaran ("Lazaran") is the Company's Chief Executive Officer, President, and Director.  He assumed these roles on June 26, 2003.  Prior to that, he served as the Company's Chief Operating Officer and Executive Vice-President at all times.

10.      Defendant Richard P. McCook ("McCook") is the Company's Chief Financial Officer and Sr. Vice President at all times.

11.      Defendants Rowland, Lazaran, and McCook are collectively referred to hereinafter as the "Individual Defendants."  During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Winn-Dixie were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

G:\cgbc\winn-dixie\pld\winn.cixie.complaint.wpd                    -3-

12.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Winn-Dixie, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the

Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Winn-Dixie, each of the Individual Defendants had access to the adverse undisclosed information about Winn-Dixie's financial condition and performance as particularized herein and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Winn-Dixie and its business issued or adopted by the Company materially false and misleading.

16.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

17.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Winn-Dixie securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (1) deceived the investing public regarding Winn-Dixie's business, operations, management and the intrinsic value of Winn-Dixie's publicly traded securities; and (2) caused Plaintiff and other members of the Class to purchase Winn-Dixie's publicly traded securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Winn-Dixie between May 8, 2000 and December 26, 2003, inclusive, (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

20.     Plaintiff's claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

22.     A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

23.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether Defendants breached their fiduciary duties by engaging in fraudulent activity; and

(c)     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Winn-Dixie Stores is a major food and drug retailer operating in 12 states in the southeastern United States and the Bahama Islands. The Company operates stores under several banners that have strong local ties and brand recognition. The Winn-Dixie, Marketplace, Thriftway and City Markets banners are utilized in the combination food and drug store format. The Save Rite and Sack & Save banners represent the grocery warehouse format.

25.    According to the Company, its strategic vision is to be the best supermarket in every neighborhood in which they operate, offering the best value, freshest products and outstanding customer service every day, while enhancing shareholder value. The Company plans to achieve this vision by effectively executing several key initiatives including: aligning stores and customers, strengthening superior customer relationships, leveraging operations and support and improving technology and process.

26.    Contrary to the Company's representations, however, Winn-Dixie (1) had no such strategic vision in place to produce "enhanced shareholder value;" (2) was unable to competitively market is Winn-Dixie product brand; (3) was unable to control costs; and (4) was unable to gain a greater market share for its supermarkets.

### Materially False And Misleading
### Statements Issued During The Class Period

27.    The Class Period commences on October 9, 2002. At that time, Winn-Dixie announced sales and results of operations for its first quarter of fiscal 2003. Sales from continuing operations for the 12 weeks ended September 18, 2002 were $2.8 billion, an increase of $25.0

million or 0.9% when compared with the same quarter last year. For the quarter, identical store sales, which included enlargements and exclude the stores that opened or closed during the period, increased 2.0%. Comparable store sales, which included replacement stores, increased 2.1% for the quarter. Net earnings were $34.8 million, or $0.25 per diluted share compared to $22.4 million, or $0.16 per diluted share, an increase of 55.3%. Net earnings from continuing operations for the 12 weeks ended September 18, 2002 were $34.8 million, or $0.25 per diluted share, an increase of $3.7 million or 12.0% when compared with the same quarter last year. Increased earnings were primarily due to improved sales and gross margins as a result of the Company's marketing initiatives, improvements in procurement and shrink reduction initiatives. The improved earnings were achieved despite costs related to the "Customer Reward Card" rollout in the Montgomery and New Orleans divisions.

28.    Commenting on these results, defendant Rowland stated:

> "Our increase in identical store sales, in the face of a weak economy, is evidence that we are improving operations and that our marketing efforts are in tune with our customers' needs. This is particularly rewarding when many of our major competitors' results are negative. We are committed to a strategic plan that provides for sustainable, profitable growth."

29.    Also on October 9, 2002, Winn-Dixie filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant McCook and reaffirmed the Company's previously announced financial results.

30.    On October 21, 2002, Winn-Dixie announced the declaration of a cash dividend of 5 cents per share on the Company's common stock for the quarter ended September 18, 2002. The dividend was payable on November 15, 2002, to shareholders of record at the close of business

November 1, 2002. Commenting on this, defendant Rowland stated: "On October 9, 2002, we reported significantly improved results for our first quarter of fiscal 2003, including positive identical store sales of 2%. In light of these results, we are pleased to pay our first quarter dividend. Our financial position continues to strengthen as a result of strong cash flow and our operations are improving each and every day. The declaration of the dividend by the Board shows confidence that the Company is meeting its planned results."

31. On January 29, 2003, Winn-Dixie announced sales and results of operations for its second quarter of fiscal 2003. Sales from continuing operations for the 16 weeks ended January 8, 2003 were $3.8 billion, an increase of $18.2 million, or 0.5%, compared with the same quarter last year. For the 28 weeks ended January 8, 2003, sales from continuing operations were $6.6 billion, an increase of $43.2 million, or 0.7%, compared with the prior year. Identical store sales, which included enlargements and exclude the sales from stores that opened or closed during the period, increased 1.3% for the quarter and 1.6% for the year. Comparable store sales, which included replacement stores, increased 1.3% for the quarter and 1.6% for the year. Net earnings from continuing operations for the 16 weeks ended January 8, 2003 amounted to $91.4 million, or $0.65 per diluted share, as compared to $52.0 million, or $0.37 per diluted share, for the corresponding quarter of the previous year. For the current year, net earnings from continuing operations were $126.2 million, or $0.90 per diluted share, compared to $83.1 million, or $0.59 per diluted share, in the previous fiscal year.

32. Commenting on these results, defendant Rowland stated:

"We are pleased to have achieved positive identical store sales of 1.3% at a time when many of our competitors are reporting negative identical store sales. Identical store sales growth and increased

`

profitability must be balanced in these times of challenging economic conditions and aggressive pricing by competitors. We continue to focus on consistent execution of the basics of supermarket operations, while investing in effective marketing programs and experimenting with new departments and formats. The early results from these new initiatives are encouraging. Also, we prepaid the $143 million remaining balance of our six-year term loan earlier today."

33.    On January 29, 2003, Winn-Dixie filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant McCook and reaffirmed the Company's previously announced financial results.

34.    On April 21, 2003, Winn-Dixie declared a cash dividend of 5 cents per share on the Company's common stock for the quarter ended April 2, 2003. The dividend was payable on May 15, 2003, to shareholders of record at the close of business May 1, 2003. Commenting on this, defendant Rowland stated: "We are pleased to pay our third quarter dividend. We continue to make progress in improving retail operations. The declaration of the dividend by the Board shows confidence that the Company is making progress towards its financial goals."

35.    On April 23, 2003, Winn-Dixie announced sales and results of operations for its third quarter of fiscal 2003. Sales from continuing operations for the 12 weeks ended April 2, 2003 were $2.8 billion, a decrease of $79.3 million, or 2.7%, compared with the same quarter last year. For the 40 weeks ended April 2, 2003, sales from continuing operations were $9.4 billion, a decrease of $36.1 million, or 0.4%, compared with the prior year. Identical store sales, which included enlargements and exclude the sales from stores that opened or closed during the period, decreased 2.0% for the quarter and increased 0.5% for the year. Comparable store sales, which included replacement stores, decreased 2.0% for the quarter and increased 0.5% for the year. Prior year sales included sales from the Easter holiday, which was in the third quarter of fiscal 2002 compared to the

fourth quarter of fiscal 2003. The Easter holiday represented a decrease in sales for the quarter as compared to the prior year of approximately 1.0%. Net earnings from continuing operations for the 12 weeks ended April 2, 2003 were $50.6 million, or $0.36 per diluted share, as compared to $51.4 million, or $0.36 per diluted share, for the corresponding quarter of the previous year. For the current year, net earnings from continuing operations were $176.7 million, or $1.26 per diluted share, compared to $134.4 million, or $0.95 per diluted share, in the previous fiscal year. Included in the current year earnings is bank agreement termination income of $52.7 million ($34.0 million net of tax, or $0.24 per diluted share).

36.     Commenting on these results, defendant Rowland stated:

> "Given the difficult challenges that our economy and our industry face, we are encouraged with our ability to maintain profitability at 1.8% of sales this quarter. The timing of Easter as well as economic uncertainty and aggressive pricing and promotion by our competitors impacted the results of the quarter. Although we did invest in some strategic price reductions in the quarter, we maintained our targeted gross margin level through efficiencies in our centralized procurement. In addition, we reduced our labor costs through improved scheduling of our store associates while continuing to provide service to our customers. Our focus will continue to be on balancing profitability and top line growth."

37.     On April 23, 2003, Winn-Dixie filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant McCook and reaffirmed the Company's previously announced financial results.

38.     On May 2, 2003, Winn-Dixie announced that defendant Rowland would retire as CEO and that defendant Lazaran would become the new CEO effective June 26, 2003. Commenting on the defendant's Rowland's resignation, the Company stated: "In his three-and-a-half years[,] Al has improved our store operations and enhanced our financial position."

39. On July 21, 2003, Winn-Dixie declared a cash dividend of 5 cents per share on the Company's common stock for the quarter ended June 25, 2003. The dividend was payable on August 15, 2003, to shareholders of record at the close of business August 1, 2003. Commenting on this, defendant Lazaran stated: "We are pleased to pay our fourth quarter dividend. The supermarket industry continues to be competitive throughout the southeastern United States. In spite of this competitive environment, our balance sheet continues to strengthen as we make progress towards our financial goals."

40. On August 7, 2003, Winn-Dixie announced sales and earnings for its fourth quarter and fiscal year ended June 25, 2003. Net earnings from continuing operations for the quarter were $62.5 million, or $0.44 per diluted share, compared to $52.8 million, or $0.37 per diluted share, for the same quarter last year. For the year, net earnings from continuing operations were $239.2 million, or $1.70 per diluted share, as compared to $187.2 million, or $1.33 per diluted share, for the previous year. Net earnings (loss) for the prior year including discontinued operations were $(21.9) million, or $(0.16) per diluted share, for the quarter and $86.9 million, or $0.62 per diluted share, for the year. During the current quarter, the company-owned life insurance issues were settled with the Internal Revenue Service, which resulted in the reversal of tax reserves totaling $28.0 million, or $0.20 per diluted share. In addition, an expense was incurred for the retirement payments to the former CEO under his employment agreement that totaled $5.0 million after tax, or $0.04 per diluted share. Sales from continuing operations for the 12 weeks ended June 25, 2003 were $2.7 billion, a decrease of $130.0 million or 4.5% compared with the same quarter last year. For the 52 weeks ended June 25, 2003, sales from continuing operations were $12.2 billion, a decrease of $166.0 million or 1.3% compared with the prior year. Identical and comparable store sales decreased 4.5%

for the quarter and 0.7% for the year. The Easter holiday fell in the fourth quarter of fiscal 2003 and the third quarter of fiscal 2002. Adjusted for the estimated impact of the timing of the Easter holiday, identical and comparable sales for the fourth quarter would have decreased 5.5%.

41.     Commenting on these results, new CEO, defendant Lazaran stated:

"During the fourth quarter we experienced an increase in competitive activity that negatively impacted our identical store sales. Many of our competitors lowered their earnings estimates over the past few months in order to significantly increase their promotional activity. In addition, military troop deployments and general economic conditions contributed to weaker sales in the fourth quarter. We have adjusted our earnings estimate for fiscal 2004 to reflect a more aggressive pricing and promotional stance going forward using our reward card to deliver those savings. We are also making improvements in our shrink and in-stock conditions."

42.     On August 7, 2003, Winn-Dixie filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendants Lazaran and McCook and reaffirmed the Company's previously announced financial results.

43.     On October 8, 2003, Winn-Dixie announced announced sales and earnings for its first quarter of fiscal 2004. Sales for the 12 weeks ended September 17, 2003 were $2.7 billion, a decrease of $164.1 million or 5.8% compared with the same quarter last year. For the quarter, identical store sales, which included enlargements and exclude the stores that opened or closed during the period, decreased 6.6%. Comparable store sales, which included replacement stores, decreased 6.6% for the quarter. Net earnings for the quarter were $1.2 million, or $0.01 per diluted share, compared to $34.8 million, or $0.25 per diluted share, for the same quarter last year.

44.     Commenting on these results, defendant Lazaran stated:

"Our previously reported earnings guidance of breakeven reflected our commitment to invest promotional dollars to increase sales.

> During the quarter, we initiated a plan to increase sales and improve earnings for the remainder of the fiscal year. The plan includes increased promotional activity, lowered pricing, improved friendly service, clean stores, improved in-stock conditions, neighborhood-specific marketing and increased capital expenditures for remodeling, especially expenditures for in-store lighting improvements. We are committed to executing and following through on the plan. Our results will depend on our execution, competitors' response and customer acceptance of our plan over the remainder of the year."

45. On October 10, 2003, Winn-Dixie filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant McCook and reaffirmed the Company's previously announced financial results.

46. On October 20, 2003, Winn-Dixie announced the declaration of a cash dividend of 5 cents per share on the Company's common stock for the quarter ended September 17, 2003. The dividend was payable on November 17, 2003, to shareholders of record at the close of business November 3, 2003. Commenting on this, defendant Lazaran stated:

> "On October 8, 2003, we reported relatively flat earnings of $0.01 per share[.] . . .Increased sales and earnings have to come from the execution of our sales and marketing plan, but are dependent on customer acceptance. Dividends are paid out of current results. The Board of Directors will closely monitor the payout ratio throughout the remainder of the fiscal year. The declaration of the dividend by the Board shows confidence in the Company."

47. The statements referenced above in ¶¶ 27-46 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them: (1) that Winn-Dixie's business operations were mismanaged and burning cash such that the Company unable to reduce excess expenses when needed; (2) that the Company had no such strategic vision in place to enhance

G:\cgbc\winn-dixie\pld\winn.cixie.complaint.wpd                    -15-

shareholder value and thus would not be able to sustain dividend payments to shareholders; (3) that the Company was unable to competitively market its Winn-Dixie product brand; (4) that Winn-Dixie was unable to gain a greater market share for its supermarkets; (5) that the loss of Canadian Imperial Bank of Commerce automated teller machines ("ATMs") would result in a decline in sales in stores that had these ATMs; and (6) that the Company recorded the carrying value of its durable assets at inflated levels and maintain inadequate reserves for self-insurance.

**THE TRUTH BEGINS TO EMERGE**

48.     On January 30, 2004, Winn-Dixie announced sales and results of operations for its second quarter of fiscal 2004. The Company also announced major new initiatives designed to improve competitive market position and profitability.  Additionally, the Company announced that Net loss for the 16 weeks ended January 7, 2004 was $79.5 million, or $0.57 per diluted share, compared to net earnings of $91.4 million, or $0.65 per diluted share, for the same quarter last year. For the current year, net loss amounted to $78.3 million or $0.56 per diluted share, compared to net earnings of $126.2 million, or $0.90 per diluted share, in the previous fiscal year.  The Company attributed its second quarter loss to several factors, including the impact of its aggressive pricing programs on gross profit margins and the increasingly competitive environment in the grocery industry.  In addition, an asset impairment charge of $36.4 million and an increase in the self-insurance reserve of $21.4 million added to the loss for the quarter.

49.     Additionally, defendant Lazaran stated:

> "We are obviously disappointed in this quarter's results and we recognize that we cannot continue down this path," said Frank Lazaran, Winn-Dixie's President and Chief Executive Officer. "For the last six months, I have led our senior management team in a comprehensive review of our entire business model. As a result, we

are announcing today a series of major actions that will change the way we do business and help us to shape the future of this Company."

50.    Moreover, the Company announced the following:

STRATEGIC PLAN
Lazaran announced the following initiatives immediately being implemented by the Company:

Brand Positioning

• Lazaran announced that the Company has retained VML, an experienced brand marketing consulting firm, to conduct consumer research and review its business strategies and marketing programs. "The key to retailing is delivering sales and growing market-share," Lazaran said. "VML understands that and is helping us to devise strategies to increase sales." In conjunction with VML, the Company is reviewing customer preference research to establish strategic priorities. Over the next few months, the Company will announce additional steps being taken to establish a clearly differentiated Winn-Dixie brand position based on price, service, convenience and product assortment.

Substantial Expense Reduction

• Lazaran announced a substantial expense reduction plan. "The impact of expense reduction will begin immediately," Lazaran said. "We will achieve a $100.0 million annual expense reduction rate based on current expense levels by July 1, 2004. We understand that we need to be an efficient company to be a competitive company." Expense reduction will be the result of, among other things, better buying practices, reduced internal corporate services, asset sales and reductions in payroll expense.

Core Market Analysis/Asset Rationalization Review

• The Company is initiating a market positioning process through which it will evaluate every market in which it operates based on market share, operating results, competitive positioning and activity, growth potential and other factors. Through this process, the Company will identify core markets targeted for future investment and growth and non-core markets to be evaluated for sale or closure. In conjunction with this effort, the Company will conduct an asset

rationalization review of all store, manufacturing and distribution facilities.

Image Makeover Program

• "We need to change the consumer's opinion of Winn-Dixie," said Lazaran, "and the place to begin that effort is in our stores." The Company is aggressively rolling out an image makeover program, focusing on interior and exterior décor, lighting and the Company's new produce layout. Ninetyeight image makeovers have been completed and approximately an additional 600 stores are targeted for image makeovers over the next 12 months at a total cost of approximately $165.0 million. Additional capital spending will be allocated in core markets as identified in the market positioning analysis to grow share in these core markets.

Comprehensive Process Re-engineering

• The Company also announced a process re-engineering initiative that is intended to enhance organizational effectiveness and accountability. This program is beginning in the central procurement function. "We understand that the types of changes we are making cannot be accomplished through strategic design alone. We must execute," Lazaran said. "When the Company centralized the procurement function, it brought all the people into one place but did not change processes and did not achieve the desired results. This time, we are re-engineering our processes to ensure that we are organized in the most functional way so that we can deliver on the strategy we have developed."

"As we implement our plan, we will make many significant decisions that we will announce in due course," Lazaran said. "We will announce as many of these decisions prior to or during our next earnings report in April. We are committed to increased transparency throughout this process with our investors, customers and associates."

Based on the current operating results and the expected funding needs for additional capital expenditures, the Company has decided to suspend indefinitely the declaration of future quarterly dividends.

51.    News of this shocked the market. Shares of Winn-Dixie dropped 27.8%, or $2.53 per share, to close at $6.56 on January 30, 2004 on extremely heavy volume.

## UNDISCLOSED ADVERSE FACTS

52.    The market for Winn-Dixie's publicly traded securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Winn-Dixie's publicly traded securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Winn-Dixie publicly traded securities relying upon the integrity of the market price of Winn-Dixie's publicly traded securities and market information relating to Winn-Dixie, and have been damaged thereby.

53.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Winn-Dixie's publicly traded securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

54.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Winn-Dixie's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Winn-Dixie and its business, prospects and operations, thus causing the Company's publicly traded securities to be overvalued and artificially inflated at all relevant times.  Defendants'

materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's publicly traded securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Winn-Dixie, their control over, and/or receipt and/or modification of Winn-Dixie's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Winn-Dixie, participated in the fraudulent scheme alleged herein.

56.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

G:\cgbc\winn-dixie\pld\winn.cixie.complaint.wpd                     -20-

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

57.    At all relevant times, the market for Winn-Dixie's publicly traded securities was an efficient market for the following reasons, among others:

(a) Winn-Dixie's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Winn-Dixie filed periodic public reports with the SEC and the NYSE;

(c) Winn-Dixie regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Winn-Dixie was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

58.    As a result of the foregoing, the market for Winn-Dixie's publicly traded securities promptly digested current information regarding Winn-Dixie from all publicly available sources and reflected such information in Winn-Dixie's stock price.  Under these circumstances, all purchasers of Winn-Dixie's publicly traded securities during the Class Period suffered similar injury through their purchase of Winn-Dixie's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

59.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Winn-Dixie who knew that those statements were false when made.

### FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

60.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein.  This claim is asserted against all defendants.

61.     During the Class Period, defendant Winn-Dixie and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: a) deceive the investing public, including plaintiff and other Class members, as alleged herein; b) artificially inflate and maintain the market price of Winn-Dixie's publicly traded securities; and c) cause plaintiff and other members of the Class to purchase Winn-

Dixie's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants Winn-Dixie and the Individual Defendants, and each of them, took the actions set forth herein.

62.    These defendants: a) employed devices, schemes, and artifices to defraud; b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Winn-Dixie's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Winn-Dixie, as alleged below.

63.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

64.    Winn-Dixie and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Winn-Dixie as specified herein.

65.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Winn-Dixie's value and performance and continued substantial growth, which include the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Winn-Dixie and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Winn-Dixie's securities during the Class Period.

66.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual

Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

67.     These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Winn-Dixie's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Winn-Dixie's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of Winn-Dixie's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Winn-Dixie securities during the Class Period at artificially high prices and were damaged thereby.

69.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Winn-Dixie, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Winn-Dixie publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

70.     By virtue of the foregoing, Winn-Dixie and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants

72.     Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

73.     Each of the Individual Defendants acted as a controlling person of Winn-Dixie within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff

contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.    As set forth above, Winn-Dixie and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 5, 2004

**CAULEY GELLER BOWMAN
& RUDMAN, LLP**

By: _____
Paul Geller, Esquire
Florida Bar No. 984795
pgeller@cauleygeller.com
Jonathan Stein, Esquire
Florida Bar No. 009784
jstein@cauleygeller.com
Jack Reise, Esquire
Florida Bar No. 058149
jreise@cauleygeller.com
197 South Federal Highway
Suite 200
Boca Raton, FL 33432
(561) 750-3000 Phone
(561) 750-3364 Fax

Samuel H. Rudman
David Rosenfeld
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

G:\cgbc\winn-dixie\pld\winn.cixie.complaint.wpd

-28-

**Paskowitz & Associates**
Laurence D. Paskowitz, Esq.
60 East 42nd Street
46th Floor
New York, NY 10165
(212) 685-0969 (tel.)
(212) 685-2306 (fax)

**Attorneys for Plaintiff**

## CERTIFICATION OF PLAINTIFF

Robert Garfeld ("Plaintiff") declares as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and authorized its filing.

2.    Plaintiff did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing deposition testimony and testimony at trial, if necessary.

4.    The following includes all of my transactions in Winn-Dixie Stores Inc (WIN) during the Class Period as defined in the Complaint:

| TRANSACTION (PURCHASE, SALE, EXCHANGE, CALL, PUT, ETC.) | TRADE DATE | PRICE | QUANTITY |
|---|---|---|---|
| Purchase | 11/21/03 | S 8.23 | 100 shares |

5.    During the three years prior to the date of this Certificate, Plaintiff has not moved to serve a representative party for a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 4th day of February, 2004.